## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

LEHIGH VALLEY COMMUNITY      :
MENTAL HEALTH CENTERS, INC.     :
2030 Tilghman Street                  :
Suite 105 B                         :
Allentown, PA 18104             :
                                :

         Plaintiff,           :
                                :

        v.                  :  Civil Action No.: _____
                                :

PENNSYLVANIA DEPARTMENT OF     :
HUMAN SERVICES               :
P.O. Box 2675                    :
Harrisburg, PA  17110-2675       :
                                :

and                               :
                                :

TED DALLAS, Individually and in his    :
official capacity as Secretary of the     :
Pennsylvania Department of Human     :
Services                        :
P.O. Box 2675                    :
Harrisburg, PA 17110-2675        :
                                :

and                               :
                                :

CHARLES EISENHOWER, , Individually   :
and in his official capacity as Director of the   :
Bureau of Program Integrity Pennsylvania   :
Department of Human Services       :
                                :

and                               :
                                :

MAGELLAN BEHAVIORAL HEALTH     :
OF PENNSYLVANIA, INC.         :
1 W. Broad Street, Suite 210       :
Bethlehem, PA 18018           :
                                :
                                :

         Defendants.        :

## **COMPLAINT FOR INJUNCTIVE RELIEF**

Plaintiff Lehigh Valley Community Mental Health Centers, Inc. for its Complaint against Defendants Pennsylvania Department of Human Services, Ted Dallas, in his individual capacity and in his official capacity as Secretary of the Pennsylvania Department of Human Services, Charles Eisenhower, in his individual capacity and in his official capacity as Director of the Bureau of Program Integrity of the Pennsylvania Department of Human Services, and Magellan Behavioral Health of Pennsylvania, Inc., states as follows:

## JURISDICTIONAL STATEMENT

1.     Plaintiff brings this action seeking injunctive relief pursuant to Rule 65 of the Federal Rules of Civil Procedure.

2.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331, which grants district courts original jurisdiction over all civil actions arising under the laws of the United States.  This action arises under Title XIX of the Social Security Act, 42 U.S.C. § 1396 *et. seq.* and the Fourteenth Amendment, § 1 of the United States Constitution.

3.     This Court also has subject matter jurisdiction pursuant to 28 U.S.C. §1367, which grants district courts supplemental jurisdiction over all claims that are "closely related" to claims over which they have original jurisdiction.

4.     Venue is proper in the Eastern District of Pennsylvania pursuant to 28 U.S.C. §1391(c), because the events giving rise to this claim occurred in this judicial district.

## PARTIES

5.     Plaintiff, Lehigh Valley Community Mental Health Centers, Inc., ("Lehigh") is a Pennsylvania corporation based in Allentown, Pennsylvania.  Lehigh is a licensed outpatient mental health clinic that currently treats approximately 8,000 adults, adolescents and children in a multicultural and bilingual environment, with emphasis on the Latino communities in the

Lehigh Valley. Lehigh is licensed by the Pennsylvania Department of Human Services and is a qualified provider of Medicaid services.

6.     Defendant, Pennsylvania Department of Human Services ("DHS") is an agency of the Commonwealth of Pennsylvania.

7.     Defendant, Ted Dallas is the Secretary of the Department of Human Services.  In his capacity as Secretary, he serves as a member of the Governor's Cabinet and is responsible for providing oversight of the DHS.

8.     Defendant, Charles Eisenhower is the Director of the Bureau of Program Integrity of the Pennsylvania Department of Human Services.

9.     Defendant, Magellan Behavioral Health Of Pennsylvania, Inc. ("Magellan") is a for-profit corporation organized pursuant to the laws of the State of Pennsylvania.

10.    Magellan is a Managed Care Organization ("MCO") which contracts with DHS to deliver Medicaid mental health benefits to Medicaid recipients in the Lehigh Valley.

11.    Lehigh contracts with Magellan to provide mental health services to Medicaid recipients who receive their benefits through Magellan. Specifically, in September 2001, Lehigh and Magellan entered into a Facility and Program Participation Agreement and a HealthChoices Medicaid Addendum to Magellan Behavioral Health, Inc. Provider Agreement (collectively, the "Magellan Provider Agreement"). A true and correct copy of the Magellan Provider Agreement is attached as Exhibit "A."

## SUMMARY OF THE CASE

12.    On July 20, 2015, the Government filed a civil False Claims Act case against Lehigh Valley Community Mental Health Centers, Inc., and related entities and individuals (the "FCA suit"). The Government did not seek injunctive relief, did not attempt to freeze assets, and

did not interfere with Lehigh Valley's treatment of its over 8,000 patients. Lehigh Valley denies having violated the False Claims Act and intended to defend itself vigorously in that suit.

13.     On July 28, 2015, DHS issued a letter purporting to suspend Lehigh's Medicaid payments, pursuant to 42 C.F.R. § 455.23, as they relate to services provided by Lehigh under the "Fee-for-Service delivery system." effective July 24, 2014.  A true and correct copy of the July 28, 2015 notice is attached hereto as "Exhibit "B."  Lehigh did not receive this letter until August 4, 2015.

14.     The sole basis for the suspension of payments is DHS's determination that there is a "credible allegation of fraud" based entirely on the allegations contained in the FCA suit.

15.     DHS suspended Medicaid payments to Lehigh before it even had an opportunity to seek administrative review or have a full and fair hearing on the merits of the wrongful suspension.  The suspension violates Federal Medicaid requirements as well as Lehigh's and its patients' due process rights and is not supported in fact or law.

16.     On July 29, 2015, Lehigh was verbally informed by Magellan's Network Director that Magellan would be suspending Medicaid payments to Lehigh, effective immediately. Although Magellan is not a "State Medicaid Agency" it purports to be suspending Medicaid payments, pursuant to 42 C.F.R. § 455.23.  Magellan has never provided written notice of its intention to suspend payments.

17.     Magellan has already stopped reimbursing Lehigh for services provided to its members.

18.     Lehigh has not been given any opportunity to challenge Magellan's suspension of payments or to defend itself against the allegations made against it.

4

19.     Magellan, in suspending Medicaid payments, has breached the Magellan Provider Agreement with Lehigh.

20.     On August 4, 2015, Magellan sent Lehigh a letter purporting to terminate the Magellan Provider Agreement.  Magellan premises its immediate termination on two grounds.  A true and correct copy of the August 4, 2015 letter is attached hereto as Exhibit "C."

21.     First, it claims that Lehigh Valley has been "disqualified from participation in, or is suspended or terminated from, a Medicare or Medicaid program…." This is simply not the case, however, as Lehigh Valley has not been "disqualified, suspended or terminated" from any program.

22.     Second, Magellan premises its termination on the fact that it had suspended Medicaid payments to Lehigh Valley.  Magellan's position – that it can immediately terminate Lehigh Valley with no due process because it unilaterally suspended Lehigh Valley with no due process – defies logic and makes a mockery of our system of justice.

23.     Magellan also intends to notify Lehigh Valley's patients of its unilateral termination, and to inform them that Lehigh Valley "will no longer be a Magellan network provider." Such notification will undoubtedly cause patients to leave Lehigh Valley. Fundamental fairness dictates that Lehigh Valley at least be given an opportunity to defend itself before its patients are driven away.

24.     Finally, to add injury to insult, Magellan's termination letter informed Lehigh Valley that it could file a letter of appeal to Magellan within thirty-three days of the immediate termination, which appeal would then result in arbitration. Lehigh Valley will be lout of business long before its challenge can be arbitrated.

25.     If this Court does not grant injunctive relief and stay the suspension of Medicaid payments Lehigh will be forced to close its doors within a matter of days, resulting in over 8,000 vulnerable patients being deprived of necessary mental health services. Lehigh's abrupt, forced closure will create a mental health catastrophe across the Lehigh Valley.

26.     Once the patients, employees, and service providers are gone, a reversal of the wrongful suspension will be of no consequence; the entirety of Lehigh's business will be gone. Furthermore, unless an immediate injunction is granted, the approximately 8,000 patients receiving treatment at Lehigh's clinics who will be removed from care will likely be forced to go without critical medical treatment due to a lack of available alternative treatment facilities in the area.

27.     Even if there were available alternative treatment facilities, forcing these patients to endure such an abrupt and traumatic transfer from their treatment providers and counselors will hamper their progress and cause irreparable regression in their treatment.

28.     There is no reason to put the patients' health, safety, and well-being at substantial risk because the suspension is not based on any allegations that call into question the level of care and treatment the patients are currently receiving or allegations that Medicaid funds are currently at risk.

## STANDING

29.     Plaintiff bring these claims on behalf of itself and on behalf of the Pennsylvania citizens residing and receiving necessary mental health treatment at Lehigh's facilities.

## THE MEDICAID STATUTE AND REGULATORY SCHEME

30.     The Medicaid program, as set forth in Title XIX of the Social Security Act, is a joint federal and state program that provides medical assistance to individuals "whose income

and resources are insufficient to meet the costs of necessary medical services." 42 U.S.C. § 1396-1. The program operates by authorizing the Federal Government to pay a percentage of the costs a state incurs for medical care, and, in return, the state is required to comply with certain federal requirements.

### Medicaid Equal Access Provision

31.     Federal law requires state Medicaid plans to employ methods and procedures to ensure that the state's payments are sufficient to enlist enough providers so that care and services are available to the general population in a geographic area. Section 1396a(a)(30)(A) of the Social Security Act, commonly referred to as the Medicaid "Equal Access Provision" requires that States:

> provide such methods and procedures relating to the utilization of, and the payment for, care and services available under the plan (including but not limited to utilization review plans as provided for in section 1396b(i)(4) of this title) as may be necessary to safeguard against unnecessary utilization of such care and services and to assure that payments are consistent with efficiency, economy, and quality of care and are sufficient to enlist enough providers so that care and services are available under the plan at least to the extent that such care and services are available to the general population in the geographic area.

42 U.S.C. §1396a(a)(19)

32.     Federal law also provides that states should administer Medicaid plans in the best interests of the recipients. Specifically, 42 U.S.C. §1396a(a)(19) requires that States:

> provide such safeguards as may be necessary to assure that eligibility for care and services under the plan will be determined, and such care and services will be provided, in a manner consistent with simplicity of administration and the best interests of the recipients.

### Suspension of Medicaid Payments - 42 C. F. R. § 455.23

33.     Federal law also requires state plans to prevent fraud and waste of Medicaid funds. Federal law mandates that a "State Medicaid agency" must suspend Medicaid payments in instances where an investigation is ongoing and upon the determination of a credible allegation of fraud, except when good cause exists to not suspend such payments.

34.     Specifically, 42 CFR 455.23(a)(1) requires that:

> The State Medicaid agency must suspend all Medicaid payments to a provider after the agency determines there is a credible allegation of fraud for which an investigation is pending under the Medicaid program against an individual or entity *unless the agency has good cause to not suspend payments or to suspend payment only in part.*

42 CFR 455.23(a)(1)(emphasis added).

35.     42 CFR 455.23(e) provides that good cause exists not to suspend Medicaid payments if *any* of the following are applicable:

***

(2)     Other available remedies implemented by the State more effectively or quickly protect Medicaid funds;

(3)     The State determines, based upon the submission of written evidence by the individual or entity that is the subject of the payment suspension, that the suspension should be removed;

(4)     Beneficiary access to items or services would be jeopardized by a payment suspension because of either of the following:

(i)     An individual or entity is the sole community physician or the sole source of essential specialized services in a community.

(ii)    The individual or entity serves a large number of beneficiaries within a HRSA-designated medically underserved area.

***

(6)     The State determines that payment suspension is not in the best interest of the Medicaid program.

8

36.     The purpose of 42 C.F.R. § 455.23 is to ensure that state agencies suspend payments to providers who are submitting fraudulent claims such that Medicaid funds are not wrongly dissipated.  76 F.R. 5966, p. 5934.

37.     The good cause exception is intended to be broad "to reflect that payment suspension is a very serious action that can potentially lead to dire consequences." 76 F.R. 5966, p. 5933.

38.     In this case, there are no allegations that Lehigh is currently submitting fraudulent claims. Thus, the intent of 42 C.F.R. § 455.23 is not implicated in this case, particularly when the absence of any risk to Medicaid funds is balanced against the suspension's resulting hardship on the Medicaid beneficiaries at issue here.

## LEHIGH WILL BE FORCED OUT OF BUSINESS BY THE IMPROPER PAYMENT SUSPENSION AND TERMINATION

39.     Lehigh has been fully licensed as an outpatient mental health clinic since May 1996, providing services to children, adolescents, adults and older adults totaling 8,211 clients.

40.     Lehigh is a well-established, community-based organization with five sites in the Lehigh Valley.  Several of its sites primarily serve the Spanish-speaking population of the area. The location of the clinics provides easy access to residents who are otherwise unable to receive care outside of their neighborhood, due to lack of transportation and funds to utilize public transpiration.

41.     Many of Lehigh's offices provide services for those living in areas where there are limited mental health services available, such as the Easton and Bethlehem locations which serve clients from as far away as Bangor, Wind Gap and East Stroudsburg, Pennsylvania.

42. Lehigh is an integral part of its community, and is recognized as much more than an outpatient mental health clinic. Many of its clients come from low socio-economic backgrounds, have been victims of trauma, have experienced violence, and come from high-risk, chaotic environments.

43. Lehigh's offices have become a place for community gathering, orientation, assistance, education, as well as mental health services.

44. Lehigh's Medical Director is a bilingual child and adolescent psychiatrist, with a specialty in geriatrics. Lehigh also employs six psychiatrists, four of whom are child and adolescent psychiatrists, and two Doctors of Nursing Practice and Certified Registered Nurse Practitioners.

45. With the shortage of psychiatrists across the Lehigh Valley, especially those specialized in child and adolescent psychiatry, Lehigh provides a critical service to this underserved population.

46. Seventy-two therapists, of whom fifty-three are bilingual and bicultural, provide services across the five office locations.

47. The Intensive Case Management department has a staff of eight therapists (including a director, six case managers, and one support staff member) who provide traditional case management services as well as "tele-health" services for high-risk individuals.

48. The psychiatrists and therapists have been working with the Lehigh for many years, and have established relationships with the clients and their families, other service providers, and the community at large. These medical professionals have a clear understanding of the culture, needs and intricacies of the clients that Lehigh serves.

49.   Lehigh also employs eighty-seven administrative staff members, many of whom are bilingual and reside in the community. These staff members include the executive team, billing department, quality review, social service, intake, reception, medical records, maintenance, and support departments. In total, 176 employees and their families depend on their employment with Lehigh.

50.   Lehigh has been a provider in the Magellan network since Magellan began doing business in the Lehigh Valley area.

51.   In 2001, Lehigh and Magellan entered into the Magellan Provider Agreement, whereby Lehigh provides mental health treatment services to Medicaid recipients covered by Magellan's benefit plans.  Exhibit "A."

52.   The Agreement has been renewed annually since.

53.   Reimbursement for services provided to Medicaid participants covered by Magellan's benefit plans accounts for approximately 75% of Lehigh's revenue.

54.   The average weekly reimbursement from Magellan ranges between $110,000 and $125,000. Without this revenue from Magellan, Lehigh would not be able to stay in business.

55.   Lehigh processes payroll each Friday, alternating between the five clinical sites (average of $235,000 bi-weekly) and directors and psychiatrists the following week (average of $65,000 bi-weekly).

56.   Lehigh anticipates not being able to make payroll as of Friday August 8, 2015.

57.   Staff, therapists and psychiatrists can hardly be expected to remain without pay. This will work a terrible hardship on Lehigh's employees and staff, as well as on their families. And, of course, without the dedicated employees, Lehigh will not be able to provide services to its patients or to transition their care to other agencies.

58.     As a result, Lehigh's 8,000 active patients will lose access to quality mental health services.  These patients simply cannot be absorbed by other local clinics which do not have the capacity to provide any care to this large group of needy patients.  This would fall especially heavily on the poor and Hispanic community that Lehigh primarily serves.  These men, women and children are already tragically underserved by the mental health profession.

59.     Patients with behavioral and mental disorders have a more difficult time developing trust in their providers. Generally, a period of "bonding" must occur between the psychiatric patient and the treatment provider before any benefits of treatment materialize. Removing the patients from Lehigh will immediately break the trust that has been developed, will retard the progress that has been made, and will cause irreparable regression in the patients' mental growth.

60.     For these patients, developing a stable, comfortable, secure, and trusting therapeutic setting is essential to the therapeutic process.  Because the patients in Lehigh's treatment centers suffer from various behavioral and mental disorders, developing a stable, comfortable, secure, and trusting therapeutic setting is essential.

61.     Abruptly and forcibly separating them from Lehigh Valley's multi-cultural and multi-lingual therapists and psychiatrists would be devastating.

62.     On July, 31 2015, after being informed by Magellan that it intended to suspend Medicaid payments based on an alleged suspension imposed by DHS (which suspension Lehigh had not yet seen or received), Lehigh filed a formal Request for Hearing/Notice of Appeal with DHS's Bureau of Hearings and Appeals requesting that DHS remove the payment suspension based on the adverse impact the suspension would have on (i) Lehigh; (ii) the state's psychiatric

system as a whole; and (iii) the 8,000 patients receiving treatment at Lehigh. A true and correct copy of Lehigh's Request for Hearing/Notice of Appeal is attached hereto as Exhibit "D."

63.     At the same time, Lehigh filed a Petition for Supersedeas, seeking a stay of the suspension order pending the adjudication of Lehigh's appeal. Although Lehigh stressed the need for an immediate hearing on the Supersedeas motion, no such hearing has yet to be scheduled. A true and correct copy of Lehigh's Petition for Supersedeas is attached hereto as Exhibit "E."

64.     On August 4, 2015, Lehigh sent Magellan a Notice of Dispute notifying Magellan that Lehigh believes it to be in breach of the Agreement and simultaneously triggering the Agreement's arbitration provision.  Exhibit "C."

### COUNT I
### Lehigh v. DHS, Dallas and Eisenhower
### Violation of 42 C.F.R. § 455.23

65.     Lehigh incorporates the allegations contained in paragraphs 1-64 by reference as if fully alleged herein.

66.     The suspension of Medicaid by DHS violates 42 C.F.R. § 455.23 because (i) there have been no credible allegations of fraud; and (ii) good cause exists not to suspend payments.

67.     Prior to the suspension of Medicaid payments to a provider, the underlying allegation that gives rise to the suspension must be deemed "credible."  42 C.F.R. §455.23(a).

68.     To be a credible allegation of fraud under federal law, the allegation should be "an allegation, which has been verified by the State, from any source, including but not limited to the following: (1) Fraud hotline complaints; (2) Claims data mining; (3) Patterns identified through provider audits, civil false claims cases, and law enforcement investigations." 42 C.F.R. § 455.2.

13

69.     Additionally, pursuant to federal law, allegations must have an indicia of reliability and the state Medicaid agency should review all allegations, facts, and evidence carefully and act judiciously on a case-by-case basis. 42 C.F.R. 455.2(3).

70.     Accordingly, the federal regulations require that state Medicaid agencies, such as DHS, conduct an independent review of an allegation in conjunction with additional facts and evidence in order to verify the allegation prior to making an adverse decision to suspend Medicaid payments.  42 C.F.R. § 455.2.

71.     Verification requires independent confirmation.  42 C.F.R. § 455.2.

72.     A pre-suspension independent review is required because, as the federal government has explicitly recognized, "payment suspension is a very serious action that can potentially lead to dire consequences." 76 F.R. 5966, p. 5933.

73.     There is no evidence that DHS complied with its statutory obligations and undertook any investigation to confirm the veracity of the allegations that gave rise to the suspension.

74.     Rather, upon information and belief, DHS merely accepted allegations contained in the False Claims Act suit as true.

75.     Because DHS failed to conduct any independent review or independent verification of the allegations and failed to conduct any investigation into the facts and evidence prior to issuing the suspension of Lehigh's Medicaid payments, the suspension was not issued in response to a "credible allegation of fraud" and is therefore, not consistent with federal law.

76.     The Medicaid regulations specifically provide that the following constitutes good cause to not suspend payments: (a) the provider serves a medically underserved area and (b) suspension would not be in the best interests of the Medicaid program. 42 C.F.R. §455.23(e).

77. The good cause exception is intended to be broad "to reflect that payment suspension is a very serious action that can potentially lead to dire consequences." 76 F.R. 5966, p. 5933.

78. Suspension of Medicaid payments would force Lehigh out of business within days. This will work a terrible hardship on Lehigh's more than 176 dedicated employees and staff, as well as on their families. And, of course, without the dedicated employees, Lehigh will not be able to provide services to its patients or to transition their care to other agencies.

79. As a result, Lehigh's 8,000 active patients would lose access to quality mental health services. These patients simply cannot be absorbed by other local clinics. These other clinics do not have capacity to provide any care (let alone quality care) to this large group of needy patients. This would fall especially heavily on the poor and Hispanic community that Lehigh primarily serves.

80. These men, women and children are already tragically underserved by the mental health profession. Abruptly and forcibly separating them from Lehigh's multi-cultural and multi-lingual therapists and psychologists would be devastating.

81. Additionally, the Government's FCA lawsuit is a more effective way to protect Medicaid funds that were allegedly paid in the past for improper claims. The FCA Suit alleges conduct that goes back many years. For example, it alleges that an excluded person, Melchor Martinez was inappropriately involved in the management of Lehigh stretching all the way back to 2000. A true and correct copy of the FCA Suit Complaint is attached hereto as Exhibit "F."

82. While Lehigh strenuously denies this allegation, Lehigh has repeatedly disclosed the investigation into this allegation to Magellan in annual contract renewals since 2011. While there is a significant disagreement as to Dr. Martinez's historical role, he currently plays no role

whatsoever at Lehigh and has not done so for several years. Thus, suspending payments does not protect against any future improper Medicaid payments based on this allegation.

83.     Similarly, the allegation concerning allegedly unqualified therapists is retrospective, alleging that Lehigh billed for services of therapists who, at the time of the service, were not properly qualified. Exhibit "F" at pp. 43-45.

84.     The Government does not allege that therapists remain unqualified, or that any current or future claims are or will be submitted for services provided by allegedly unqualified therapists. *Id.* Therefore, again, the FCA Suit provides an alternative remedy that more effectively protects Medicaid funds.

85.     The sole allegation in the FCA Suit that seems to include current claims, involves billing for medication management services. Exhibit "F" at pp. 35-43.

86.     As an initial matter, Lehigh vehemently denies the Government's allegation that Magellan has consistently required that medical management visits last a minimum of fifteen minutes in order to be billed or that Lehigh improperly billed for these services. Indeed, Lehigh intends to prove that it has not filed false or fraudulent claims for these services. Nevertheless, when Magellan raised this issue, Lehigh ensured that it met all of Magellan's requirements. Therefore, there is no need to suspend payments to accommodate future claims resulting from this allegation.

87.     DHS' suspension of Medicaid funds contravenes  42 C.F.R. §455.23 and should be set aside pending a full and fair review on the merits by DHS via the administrative hearing process.

**WHEREFORE,** Plaintiff requests this Court grant their Motion and:

a.      Enter a temporary restraining order or preliminary injunction enjoining the suspension of Lehigh's Medicaid payments and preserving the status quo as it existed before July 28, 2015, until such time as Plaintiff is afforded a full and fair administrative review of DHS' decision to suspend payments and Plaintiff receives a ruling following the hearing;

b.      In the event the suspension is not overturned at the administrative hearing level, order the suspension stayed until such time as the patients currently receiving treatment at Lehigh's facilities secure alternative care; and

c.      Award Lehigh any such further relief as the Court deems just and proper.

<div align="center">

**COUNT II**
**Lehigh v. DHS, Dallas and Eisenhower**
**VIOLATION OF DUE PROCESS**
(Asserted for Lehigh's Patients)

</div>

88.     Lehigh incorporates the allegations contained in paragraphs 1-87 by reference as if fully alleged herein.

89.     The due process clause of the United States Constitution requires a hearing before an impartial decision maker be provided at a meaningful time and in a meaningful manner prior to the government taking action which deprives a liberty or property interest.

90.     Lehigh has a constitutionally protected interest in remaining in business and remaining as a provider in the Medicaid program. Suspending Medicaid payments to Lehigh, even on a temporary basis, will force it out of business and will effectively terminate it from the Medicaid program. As such, DHS cannot suspend Medicaid payments until after Lehigh is afforded a full and fair administrative review of DHS' suspension.

91.     In addition, the patients at issue in this action have a protected interest in continuing to receive Medicaid sponsored treatment and to have equal access to such treatment as provided for by Section 1396a(a)(30)(A) of the Medicaid Act.

92.     Further, the patients are entitled to a state Medicaid system administered in the Medicaid beneficiaries' best interests as provided for by Section 1396a(a)(30)(A).

93.     To ensure compliance with the Equal Access Provision, states are to study the effects of any proposed changes to the state's Medicaid system prior to effectuating the change.

94.     If implemented, the purported suspension will result in the closing down of Lehigh's operations entirely. Lehigh's patients will likely be unable to locate alternative treatment and thus will be denied their right to equal access to Medicaid services in violation of Section 1396a(a)(30)(A).

95.     DHS did not conduct any investigation into how the suspension will affect Pennsylvania's Medicaid beneficiaries' access to Medicaid sponsored treatment.

96.     Furthermore, permitting the suspension to take effect will unnecessarily force 8,000 patients to abruptly move from their current treatment providers which will trigger anxiety and emotional trauma and will jeopardize these patients' treatment progress.   As such, the suspension will amount to a denial of the patients' statutorily protected access to a state Medicaid system that is being administered in their best interests in violation of Section 1396a(a)(30)(A).

97.     Because there have been no allegations that the patients' safety is at risk, DHS' suspension of Lehigh's Medicaid payments was issued arbitrarily, capriciously, and without rational basis. To permit the suspension to take effect under these circumstances and force the patients to move from their treatment providers before any hearing on the merits is conducted shocks the conscience and offends judicial notions of fairness such that Defendants are in violation of patients' procedural and substantive due process rights.

98.     Because Defendants' actions and procedures in suspending Lehigh's Medicaid payments, which in turn requires that the patients be abruptly removed from Lehigh's facilities,

violate the due process clause of the United States Constitution, the suspension must be set aside until a review on the merits is completed.

**WHEREFORE,** Plaintiff requests this Court grant their Motion and:

a.    Enter a temporary restraining order or preliminary injunction enjoining the suspension of Lehigh's Medicaid payments and preserving the status quo as it existed before July 28, 2015, until such time as Lehigh is afforded a full and fair administrative review of DHS' decision to issue the suspension and Lehigh receives a ruling following the hearing;

b.    In the event the suspension is not overturned at the administrative hearing level, order the suspension stayed until such time as the patients currently receiving treatment at Lehigh's facilities secure alternative care; and

c.    Award Lehigh any such further relief as the Court deems just and proper.

## COUNT III
### Lehigh v. Magellan
### BREACH OF CONTRACT

99.    Lehigh incorporates the allegations contained in paragraphs 1-98 by reference as if fully alleged herein.

100.    In 2001, Lehigh and Magellan entered into a the Magellan Provider Agreement, whereby Lehigh provides mental health treatment services to Medicaid recipients covered by Magellan's benefit plans.  See Exhibit "A."

101.    The Magellan Provider Agreement has been renewed annually.

102.    Magellan is refusing to release payments to Lehigh based on DHS's finding of a "credible allegation of fraud."

103.    The Magellan Provider Agreement does not allow for withholding payments based on "allegation of fraud."

104.    Magellan is withholding payments to Lehigh contrary to the terms of the Magellan Provider Agreement.

105.    Magellan also stopped payment on checks that it sent to Lehigh.  Specifically, on July 30, Lehigh received five checks totaling $85,108.20 from Magellan for services that Lehigh provided to Magellan insureds.

106.    Lehigh deposited the checks on July 30, 2015

107.    On the morning of July 31, Lehigh's bank credited the checks to its account. However, within an hour, the bank re-listed the sums as "deposit not available."  The bank ultimately took the money from the account, listing the reason as "stop payment" placed on the checks.

108.    Magellan's unilateral decision to stop payment on these checks is a breach of contract.

109.    In its August 4, 2015 termination letter, Magellan indicates that it is terminating the Agreement pursuant to "pursuant to Section 11.3(d)."  Exhibit "C."

110.    Section 11.3 of the Magellan Provider Agreement states:

> **Section 11.3 Termination With Cause by Magellan**. Magellan shall have the right to terminate this Agreement immediately by giving written notice to Facility upon the occurrence of any of the following events:
>
> ***
>
> (d)    Facility's suspension or exclusion from participation in Payor's programs;

Exhibit "A."

111.    Lehigh has not been suspended or excluded from the Medicaid Program.

112.    None of the events giving rise to "with cause termination" enumerated in Section 11.3 of the Magellan Provider Agreement have occurred.

113.    Magellan is improperly attempting to terminate the Magellan Provider Agreement "with cause."

20

114.   In its termination letter, Magellan also premises its termination on Sections 4.1.2 and 4.1.3 of the Medicaid Addendum.

115.   Section 4.1.2 provides that the Addendum "may be terminated immediately upon written notice…If Provider is disqualified from participation in, or is suspended or terminated from, a Medicare or Medicaid program or any other government sponsored health program;"

116.   Lehigh has not been disqualified from participating in, suspended or terminated from any government sponsored health program.   Thus, Magellan's reliance on Section 4.1.2 is misplaced.

117.   Section 4.1.3 provides that the Addendum "may be terminated immediately upon written notice…. If Magellan receives notice that state or federal reimbursement or funding is no longer available for services provided pursuant to this HealthChoices Medicaid Addendum."

118.   This provision does not deal with the situation presented here, a proposed payment suspension of an individual provider.   Instead, it anticipates a situation where funding is no longer available for specific services that are provided by all providers under the Magellan Provider Agreement.

119.   Even if this provision was implicated by DHS's payment suspension, it is fundamentally unfair to allow Magellan to terminate Lehigh based on that suspension even before Lehigh has an opportunity to challenge the suspension.

120.   The Magellan Provider Agreement contains an Arbitration provision.   *Id.* at Section 10.

121.   This Court nonetheless has the ability to grant injunctive relief in an otherwise arbitrable dispute, provided that the traditional prerequisites for such relief are satisfied.

**WHEREFORE**, Plaintiff requests this Court grant their Motion and:

a.      Enter a temporary restraining order or preliminary injunction enjoining the suspension of Medicaid payments and termination from the Magellan Provider Agreement and preserving the status quo as it existed before July 28, 2015, pending the resolution of the AAA arbitration on Lehigh's claims arising from the Agreement.

b.      In the event the suspension and termination are not overturned following AAA arbitration, order the suspension stayed until such time as the patients currently receiving treatment at Lehigh secure alternative care; and

c.      Award Lehigh any such further relief as the Court deems just and proper.

<div style="margin-left:40%">

Respectfully submitted,

ECKERT SEAMANS CHERIN
  & MELLOTT, LLC

David M. Laigaie, Esquire (PA I.D. No. 63010)
Joshua D. Hill, Esquire (PA I.D. No. 93772)
Two Liberty Place
50 S. 16th Street, 22nd Floor
Philadelphia, PA  19102
*dlaigaie@eckertseamans.com*
*jhill@eckertseamans.com*
(215) 851-8400 (Telephone)
(215) 851-8383 (Telecopy)

*Counsel for Plaintiff, Lehigh Valley
Community Mental Health Centers, Inc.*

</div>

*M1405597.DOCX*