IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **LEHIGH VALLEY COMMUNITY** | : | **CIVIL ACTION** |
| **MENTAL HEALTH CENTERS, INC.,** | : | |
| Plaintiff | : | |
| | : | |
| vs. | : | **NO. 15-4315** |
| | : | |
| **PENNSYLVANIA DEPARTMENT OF** | : | |
| **HUMAN SERVICES, et al.,** | : | |
| Defendants | : | |

## M E M O R A N D U M

**STENGEL, J.**                                                                              October 26, 2015

Plaintiff Lehigh Valley Community Mental Health Centers filed its second motion for a Temporary Restraining Order against the defendants seeking a court Order instructing Defendant Magellan to make future Medicaid payments consistent with four conditions imposed by Defendant DHS and approved by the plaintiff; and instructing Defendant Magellan to provide an accounting and to make all payments improperly withheld from the plaintiff contrary to the four conditions within three business days. The defendants filed a response. I conducted a series of telephone conferences with counsel, and for the following reasons, I will deny the motion in its entirety.

## I.  BACKGROUND

The plaintiff provides mental health services to citizens of Lehigh and Northampton Counties, a great majority of which are covered by Medicaid. The plaintiff and some of its officers were named as defendants in a False Claims Act action in this district, which triggered Defendant DHS to suspend further Medicaid payments pursuant

to 42 C.F.R. § 455.23.[1]  See United States of America and State of North Carolina, ex rel. Karen Smith v. Martinez, et al., 11-cv-2756 (E.D. Pa July 21, 2015).

On August 5, 2015, at a hearing on the plaintiff's first emergency TRO motion, the parties informed the Honorable Nitza I. Quiñones Alejandro that Defendant DHS had decided to make a "good cause" exception to its suspension of Medicaid payments to the plaintiff, as long as the plaintiff met the following four conditions:

> 1)  Payments are to be used exclusively to cover payroll and operating expenses.  The plaintiff shall submit to Magellan and DHS the payroll registry and a record of the operational expenses for which the plaintiff will use the payments.
>
> 2)  Payroll expenses for practitioners shall be limited to those practitioners who are qualified and rendering services in accordance with Medical Assistance and Magellan contract requirements (for example, psychiatrist billing for medication checks and evaluations), to be verified within ten business days.
>
> 3)  Payroll expenses are excluded for the individuals named as defendants in the lawsuit filed by the United States Attorney for the Eastern District of Pennsylvania against the plaintiff and others.
>
> 4)   The plaintiff shall cooperate with Magellan in transition planning.

---

[1] The Code of Federal Regulations provides for the suspension of payments in cases of fraud: (a) Basis for suspension:  (1)  The State Medicaid agency *must* suspend all Medicaid payments to a provider after the agency determines there is a *credible allegation of fraud* for which an investigation is pending under the Medicaid program against an individual or entity unless the agency has *good cause* to not suspend payments or to suspend payment only in part;  (2) The State Medicaid agency may suspend payments *without first* notifying the provider of its intention to suspend such payments; (3) A provider may request, and must be granted, administrative review where State law so requires.

42 C.F.R. § 455.23 (emphasis added).

See Document #14-3.

After the plaintiff accepted these conditions, see Document #14-4, the defendants made representations to Judge Quiñones that they would resume payments to the plaintiff subject to the DHS conditions, and that an orderly transfer of clients from the plaintiff's facilities would begin. Thus, the plaintiff's clients would not be without proper mental health care and the plaintiff would be able to pay its employees during the transition period. The judge denied the motion as to Defendant Magellan,[2] finding that the plaintiff had not sustained its burden of showing irreparable harm based on the above assurances to her that Medicaid payments to the plaintiff would resume pursuant to the DHS conditions; that the transition would be orderly for patients and for employees; and that the plaintiff would not be forced out of business prematurely.

On September 3, 2015, the plaintiff filed its second emergency motion for a TRO claiming that the defendants had failed to act in good faith and had withheld more than $405,000 in Medicaid payments to the plaintiff for services rendered. Further, it claimed that payments were delayed and reduced in an arbitrary manner which rendered the plaintiff incapable of making payroll. At that time, the plaintiff owed $90,000 in back pay, and $120,000 in back payroll taxes.

## II. DISCUSSION

A Temporary Restraining Order is an extraordinary form of relief, designed to temporarily maintain the status quo while the parties prepare to litigate the issues on a

---

[2] During the hearing, counsel for the plaintiff represented that the plaintiff was no longer seeking a TRO against Defendant Pennsylvania Department of Human Services. Accordingly, Judge Quiñones deemed the emergency motion withdrawn as to DHS. See Document #6.

motion for a preliminary injunction. Pileggi v. Aichele, 843 F. Supp. 2d 584, 592 (E.D. Pa. 2012). Preliminary injunctive relief is an extraordinary remedy and should be granted only in limited circumstances. Kos Pharms., Inc. v. Andrx Corp., 369 F.3d 700, 708 (3d Cir. 2004). The standard for granting a TRO under Federal Rule of Civil Procedure 65 is the same as that for issuing a preliminary injunction. Pileggi, 843 F. Supp. 2d at 592 (citing Bieros v. Nicola, 857 F. Supp. 445, 446 (E.D. Pa. 1994)).

In determining whether to grant a TRO, a court must consider whether the party seeking the injunction has satisfied four factors: (1) a likelihood of success on the merits; (2) it will suffer irreparable harm if the injunction is denied; (3) granting relief will not result in even greater harm to the non-moving party; and (4) the public interest favors such relief. Miller, et al. v. Mitchell, 598 F.3d 139, 147 (3d Cir. 2010) (citing Child Evangelism Fellowship of New Jersey Inc. v. Stafford Twp. Sch. Dist., 386 F.3d 514, 524 (3d Cir. 2004)). The court must also balance these four factors. Allegheny Energy, Inc. v. DQE, Inc., 171 F.3d 153, 158 (3d Cir. 1999). Here, a majority of these factors weigh heavily against granting the requested relief.

1. A Likelihood of Success on the Merits

The complaint alleges that the suspension of Medicare payments violated 42 C.F.R. § 455.23 because there were no credible allegations of fraud, and because good cause existed not to suspend those payments. It further alleges that the suspension amounted to a denial of its constitutionally protected interest in remaining as a Medicaid provider, and a violation of the due process clause of the U.S. Constitution. The complaint finally claims that Defendant Magellan breached its contract with the plaintiff.

The plaintiff's likelihood of success on the merits is not strong under these circumstances. Because the plaintiff is a defendant in a False Claims Act action, Defendant DHS legally suspended further payments to it. See 42 C.F.R. § 455.23(a)(1). The fact that Defendant DHS later decided to make a good cause exception and lift the suspension does not undermine the fact that the defendants had the right to act as they did initially with the suspension. Further, the regulations allow for Defendant DHS to suspend payments without first notifying the provider of its intention to suspend such payments. See 42 C.F.R. § 455.23(a)(2). Thus, DHS's suspension cannot be viewed as violating the due process rights of the plaintiff or its clients. Next, the plaintiff took advantage of the administrative review contemplated in the regulations by submitting a letter dated July 30, 2015 to Defendant Magellan which was then forwarded to Defendant DHS. Upon review, Defendant DHS granted the plaintiff's request to lift the payment suspension. See 42 C.F.R. § 455.23(a)(3); see also Document #14-3. Finally, the contract between the plaintiff and Defendant Magellan provides that the latter has the right to terminate the agreement upon the plaintiff's suspension from participation in Medicare programs. See Document #14-1. Thus, because there is little likelihood of success on the merits, this first factor weighs heavily against the issuance of a TRO.

2. The Plaintiff would not Suffer Irreparable Harm

Irreparable injury is "potential harm which cannot be redressed by a legal or equitable remedy following a trial." Instant Air Freight v. C.F. Air Freight, et al., 882 F.2d 797, 801 (3d Cir. 1989). A court may not grant preliminary injunctive relief unless "[t]he preliminary injunction [is] the only way of protecting the plaintiff from harm." Id.

The relevant inquiry is whether the party moving for the injunctive relief is in danger of suffering the irreparable harm at the time the preliminary injunctive relief is to be issued. Id.  Speculative injury does not constitute a showing of irreparable harm.  Continental Group, Inc. v. Amoco Chems. Corp., 614 F.2d 351, 359 (3d Cir. 1980).  "The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm." Instant Air Freight, 882 F.2d at 801 (quoting Sampson v. Murray, 415 U.S. 61, 90 (1964)).

Here, the plaintiff claims that denial of the relief requested would result in its going out of business.  It further claims that denying the injunction would cause thousands of clients to be left without the proper mental health care.  Due to the transition plan with which the plaintiff agreed to cooperate, more and more clients were being transferred each day and receiving care elsewhere in the same geographic area.  Even the plaintiff's employees were finding similar jobs with other providers.  In addition, the plaintiff has received several hundred thousand dollars in Medicaid reimbursements since Defendant DHS lifted the suspension.  The money was distributed in accordance with the four conditions to which the plaintiff also agreed.  Thus, this second factor also weighs heavily against the issuance of a Temporary Restraining Order.

      3. <u>The Defendants will not Suffer Greater Harm if Relief is Granted</u>

It is apparent that the defendants are vigilant with the public monies entrusted to them.  They have been given the task of protecting public funds, and in this case, have attempted to do just that.  Before lifting its suspension, Defendant DHS suggested four

conditions to which the plaintiff agreed. Defendant DHS interpreted those conditions based on its duty to protect the public money. Other than being involved in potentially misdirecting public funds and violating the public trust, no real harm would come to the defendants if the requested relief were granted. This factor weighs slightly against the issuance of a TRO.

    4. <u>The Public Interest does not favor the Relief Requested</u>

The public deserves the utmost diligence in the protection of its financial resources. It is, thus, not in the best interest of the public to allow those funds to be disseminated without restriction to an entity who is a defendant in a False Claims Act action during the pendency of that action. This factor weighs heavily against the issuance of a TRO.

## III. CONCLUSION

In reviewing the complaint and the motion for TRO, it is clear that the plaintiff has not shown: (1) a likelihood of success on the merits; (2) an immediate irreparable injury if the requested relief is not granted; and (3) that the public interest favors the issuance of a TRO. Accordingly, I will deny the second emergency motion for TRO filed on September 3, 2015.

During the final telephone conference, counsel for the plaintiff requested an extension of the sixty-day lifting of the suspension. The defendants object to this request because it was not part of either of the plaintiff's motions for TRO. While I agree that an extension was not requested in the motions, I will still deny the request on its merits.

The plaintiff insists that a sixty-day extension is necessary for the benefit of its clients. In September 2015 alone, several hundred clients allegedly arrived at its doors seeking treatment claiming an inability to find new treatment centers. The plaintiff also suspects that there are many other clients who are receiving no treatment elsewhere, but have not yet contacted the plaintiff for assistance. It argues that a sixty-day extension of the lifting of the suspension would guarantee continued treatment for these clients.

I agree with the defendants that an extension of the lift is unnecessary. All of the parties understood when the suspension was lifted that there would be a sixty-day transition period, and that that transition would hopefully be safe and orderly. According to Defendant DHS, the transition has been as good as it could have been, and Defendant Magellan has been engaging in activities sufficient to ensure a smooth and orderly transition. As part of the four conditions, the plaintiff agreed to cooperate with Defendant Magellan and not schedule any appointments after the sixty-day period. Any clients who continue to call for treatment or who appear at the plaintiff's door can be given the list of thirty local mental health care providers compiled by Defendant Magellan. Accordingly, I will deny the second motion for temporary restraining Order.

An appropriate Order follows.